IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ANTONIO BUSH,              )
                           )
    Petitioner,             )        NO. 3:07-00630
                           )        JUDGE HAYNES
                           )
                           )
                           )
STEPHEN DOTSON, Warden,    )
                           )
    Respondent.             )

## MEMORANDUM

Petitioner, Antonio Bush, filed a <u>pro se</u> action under 28 U.S.C. § 2254, seeking to set aside his convictions for especially aggravated robbery, aggravated burglary and aggravated assault, for which he received respective concurrent sentences of 22 years, 4 years and years, for a total effective sentence of 22 years. After a review of the petition, the Court appointed the Federal Public Defender to represent the Petitioner, and an amended petition was filed on August 28, 2008. Petitioner's specific claims are that: (1) the State knowingly presented false testimony by two witnesses; (2) the State withheld exculpatory evidence in violation of <u>Brady v. Maryland,</u> 373 U.S. 83 (1963); (3) his sentences were improperly enhanced based on facts not found by a jury; (4) he was denied ineffective assistance of counsel; (5) he was denied due process when the state court allowed testimony about petitioner's alleged prior bad acts unrelated to the case; and (6) the evidence at trial was insufficient to support a conviction. As discussed <u>infra</u>, Petitioner has limited his claim to a challenge to the sufficiency of the evidence on one of his convictions.

Before the Court are Petitioner's motion for summary judgment (Docket Entry No. 49) and the Respondent's motion for summary judgment (Docket Entry No. 52). In his motion, Petitioner contends that the state's evidence failed to prove the taking of any property from a resident at the

robbery site. Respondent contends that the state courts' ruling on this claim was a reasonable application of federal law.

## A. Procedural History

On December 13, 2001, a jury convicted Petitioner of especially aggravated robbery, aggravated burglary and aggravated assault and was sentenced to an effective term of 22 years. On appeal, the Tennessee Court of Criminal Appeals affirmed his conviction and sentence. State v. Bush, No. M2002-2390-CCA-R3-CD, 2004 WL 794755 (Tenn. Crim. App. April 14, 2004). On October 4, 2004, the Tennessee Supreme Court denied petitioner's application for permission to appeal from the judgment of the Court of Criminal Appeals.

On May 11, 2005, Petitioner filed a petition for post-conviction relief that was denied. On September 7, 2006, the Tennessee Court of Criminal Appeals affirmed the trial court order and on December 27, 2006, the Tennessee Supreme Court denied his application for permission to appeal. Bush v. State, No.2005–2967-CCA-R3-PC, 2006 WL 2682825 (Tenn. Crim. App. Sept. 7, 2006).

On May 24, 2007, the Petitioner filed a pro se action in the United States District for the western District of Tennessee. On June 8, 2007, the case was transferred to this Court. On June 21, 2010, the Court conducted a status conference. At the hearing, the parties agreed that an evidentiary hearing was not necessary to determine this matter and that the parties would argue the matter by brief. (Docket Entry No. 48, Agreed Order).

## B. Review of the State Record

The facts[1] underlying the Petitioner's convictions are set forth by the Tennessee Court of Criminal Appeals as follows:

> This case relates to five men breaking into the home of Pascual Lopez-Blacos ("Mr.Lopez"), demanding money from him, and shooting him in the leg. Mr. Lopez testified that he was from Mexico, that he had been in the United States for six years, and that he was in this country illegally. He said that he met his wife in Tennessee and that they had two young daughters. He said that on the night of July 26, 2000, he was asleep in his bed and that one of his daughters was sleeping beside him. He said that his nephew, Angel Lopez-Moralez, was in a second bedroom and that a friend, Joaquin Martinez-Abacian, was in another room of the house. He said that he heard his bedroom door open and that two men came into the room. He said that one man had a pistol and was wearing pantyhose over his head and that the other man was carrying a shotgun. He said both men were African-American and wore black clothing. He said that the man with the pistol came to the bed and demanded "dinero," that he told the man he did not have any money, and that the man asked for "dinero" again. He said the man hit him on the head with the pistol, cutting his head, and shot him in the leg. He said that the gunshot woke up his daughter and that the man with the shotgun picked her up. He said he told the men he had money in the kitchen and started walking to the kitchen but fell onto the living room couch. He said the man with the shotgun told the man with the pistol that they needed to leave because the police were coming. He said the men left his house.
>
> Mr. Lopez testified that the police arrived and that he went to the hospital. He said he could not walk for three months due to the gunshot wound and acknowledged that he was in a lot of pain for about three and one-half months. He indicated that he had a scar on his leg as a result of the shooting and identified Michael May as the man who carried the shotgun. On cross-examination, he admitted that at the defendant's and Michael May's preliminary hearing, he identified May as the man who shot him with the pistol. He also acknowledged testifying at the hearing that he did not take his eyes off the shooter.
>
> Angel Lopez-Moralez testified that he is Mr. Lopez's nephew and lived with Mr. Lopez at the time of the robbery. He said that when the men came into the house, he was in a second bedroom. He said that he heard someone at his bedroom door, that a man came into his room, and that the man hit him on the head with a pistol. He said the man was wearing black clothes, boots, gloves, and pantyhose over his head. He said that the man wanted "dinero" and that he gave the man his wallet, which contained eighty dollars. He said that the man left his room and that he heard a

---

[1]State appellate court opinion findings can constitute factual findings under 28 U.S.C. § 2254(d) with a statutory presumption of correctness. <u>Sumner v. Mata</u>, 449 U.S. 539, 546-47 (1981).

gunshot. He said that he could hear men talking to his uncle and that after the men left the house, he came out of his bedroom and found his uncle bleeding on the living room couch. He said his uncle had been shot in the leg and was taken to a hospital. He said his brother and sister-in-law also lived with Mr. Lopez but were not home at the time of the robbery. He said that after the robbery, they discovered that a small stereo and a compact disc (CD) were missing from their bedroom. He said that the police found his wallet outside but that the eighty dollars was gone.

Michael E. May, who was indicted with the defendant, testified that it was the defendant's idea to rob Mr. Lopez and that the defendant told him Mr. Lopez was a drug dealer and an illegal alien. He said that on the night of the robbery, he drove the defendant, Delmiccio Tigg, and two Hispanic men to Mr. Lopez's house. He said that he did not wear a mask but that some of the other men wore pantyhose over their heads. He said that he carried the defendant's sawed-off shotgun and that the defendant had a 9mm handgun. He said that the defendant kicked in Mr. Lopez's back door and that everyone went inside the house. He said that the defendant and Tigg went into Mr. Lopez's bedroom and that the two Hispanic men went into another bedroom. He said he followed the defendant and Tigg to Mr. Lopez's bedroom door but then went back outside to the car. He said that while he was outside, he heard a gunshot and returned to the house. He said that the defendant was in the kitchen, that the defendant was pointing a gun at Mr. Lopez, and that Tigg was blocking a little girl from the defendant. He said that the defendant was demanding money but that Mr. Lopez said he did not have any. He said that blood was on the floor and that Mr. Lopez had been shot. He said that he told the defendant to "come on" and that they ran out of the house. He acknowledged talking to the state about his case. He said the state had made no promises in return for his testimony but had told him that it would make favorable recommendations to the trial court if he testified truthfully.

On cross-examination, May testified that he was arrested eight days after the robbery. He said Detective Dan Goodwin interviewed him, and he acknowledged lying to Detective Goodwin during his initial interview, telling the detective that he did not know anything about the crimes. He also acknowledged telling the detective that he did not hear any gunshots during the robbery. He said, though, that he would not lie to the jury. He acknowledged that he was going to plead guilty and that he wanted some leniency from the state and the trial court. He denied that Detective Goodwin told him he would get leniency if he helped convict the defendant. He acknowledged that at a preliminary hearing, Mr. Lopez identified him as the shooter.

Delmiccio Tigg testified that on July 26, 2000, he, the defendant, and Michael May were in the defendant's apartment and talked about robbing Mr. Lopez. He said that it was the defendant's idea to rob Mr. Lopez and that the defendant thought Mr. Lopez would not report the robbery to the police. He said that the three of them and two Hispanic men went to Mr. Lopez's house and that the defendant kicked in the

4

door. He said that he, May, and the defendant wore pantyhose over their heads; that May had the defendant's shotgun; that the defendant had a 9mm pistol; and that one of the Hispanic men also had a 9mm pistol. He said that he and the defendant went into Mr. Lopez's bedroom and that the defendant pointed the pistol at Mr. Lopez. He said that the defendant demanded money but that Mr. Lopez said he did not have any. He said that Mr. Lopez grabbed for the defendant's gun, that the defendant pushed Mr. Lopez away, and that the defendant shot Mr. Lopez in the knee. He said that a little girl was about three to four feet away from Mr. Lopez at the time of the shooting and that he stood between the little girl and the defendant because he did not want her to see what was happening. He said that after the shooting, Michael May came in and pulled the defendant out of the room. He said they all left the home.

Tigg acknowledged knowing a man named Cordell Nelson and said that Nelson was present at the defendant's apartment before the robbery when everyone was talking about robbing Mr. Lopez. He said, though, that Nelson did not participate in the crimes. He said that three or four days after the robbery, he saw Nelson at the defendant's apartment complex. He said that Nelson was sitting in a car, that he ran up to the car and sprayed Nelson with Mace, that he grabbed a bag of drugs off Nelson's lap, and that he ran to the defendant's apartment. He said that when he got to the apartment, he took some of the drugs out of the bag and got into bed. He said that Nelson came to the apartment, took back the bag of drugs, and took the 9mm pistol that the defendant had used on July 26. He said the defendant decided to accuse Nelson of shooting Mr. Lopez because Nelson now had the 9mm pistol. He said that when he was arrested, he told Detective Goodwin that Cordell Nelson participated in the robbery and shot Mr. Lopez. He said that he later told the detective the truth about the defendant's shooting Mr. Lopez. He said that he was charged with the same crimes as the defendant and that the state had not promised him anything in return for his testimony. He said, though, that he expected the state to make favorable recommendations to the trial court. On cross-examination, he said that he had talked to the prosecutor about pleading guilty and that his case had not been set for trial. The state later proved through a deputy court clerk that both May's and Tigg's cases had been set for trial the same date as the defendant's trial.

Lavondis Cordell Nelson testified that he and some other men used to gather in an apartment at the Bell-Aire Apartment complex. He said that on the day of the robbery, the defendant, May, and Tigg were in the apartment and said they had to go somewhere. He said that they did not tell him where they were going but that they were wearing dark clothing. He said that when they returned, two of them talked about what had happened and that May was carrying a shotgun. He said that a couple of days later, he had an ounce of cocaine in a bag and was sitting in a car in the apartment complex. He said that he was waiting to make a drug sale and that the bag of cocaine was on his lap. He said that someone came around the back of the car, opened the door, sprayed Mace inside, grabbed the bag, and ran. He said that he did not see the man but later learned it was Delmiccio Tigg. He said that the defendant

5

gave him the defendant's 9mm pistol, that he went to an apartment, and that he found Tigg in bed and pretending to be asleep. He said that he confronted Tigg and took back the bag of cocaine but that some of the cocaine was missing. He said that Detective Goodwin later questioned him about the robbery and that he told Detective Goodwin the defendant gave him the gun. On cross-examination, Nelson testified that he used to be a drug dealer but that he always tried to tell the truth. He said that the defendant wanted the 9mm pistol back but that he would not give it to the defendant.

Officer Tracy Mansfield of the Murfreesboro Police Department testified that on July 30, 2000, he heard a request over his police radio for police to stop a maroon Chevrolet Astro van. He said that he saw the van, stopped it, and that the defendant and Tigg were inside. He said that a shotgun also was in the van and that he gave the gun to Officer Jason Higgens.

Detective Dan Goodwin of the Rutherford County Sheriff's Department testified that he was dispatched to Mr. Lopez's home on July 26 and investigated the robbery. He said that according to witnesses, five men wearing gloves and dark clothing came into the house. The men were carrying guns and took two wallets, one from Angel Lopez-Moralez and one from Joaquin Martinez-Abacian. He said that an officer found Mr. Martinez-Abacian's wallet in the front bedroom, that the wallet appeared to have been dropped during the robbery, and that no money was missing from it. He said that an officer also found Mr. Lopez-Moralez's wallet. He said that the door to the home had been kicked open and that a large bloodstain was on the living room couch. He said that he interviewed Delmiccio Tigg on July 30 and August 2, 2000. He said that during Tigg's first interview, Tigg stated that Cordell Nelson participated in the robbery and shot Mr. Lopez. He said that during the second interview, Tigg stated that Nelson was not present and that the defendant used the pistol during the crimes. He said that he also interviewed Michael May and that at first, May denied knowing anything about the robbery. He said that May later admitted being at the robbery and carrying the shotgun.

Detective Goodwin testified that he interviewed the defendant on July 31 and that the defendant told him the following: The defendant loaned May a shotgun, and May drove a blue car to Mr. Lopez's house while the defendant followed in the Astro van. The defendant pointed out Mr. Lopez's house to May, and the defendant saw May, Tigg, and the two Hispanic men run inside the home. The defendant heard the men yelling about "deniro," and the two Hispanic men came out of the house carrying a stereo and other items. Detective Goodwin testified that the defendant told him he could find the 9mm pistol in an apartment at the Greystone Apartment complex. He said that after he recovered the weapon from that apartment, he interviewed Cordell Nelson and Nelson admitted leaving the pistol there. He said the police found a bullet in the mattress in Mr. Lopez's bedroom and a shell casing. He said he sent both to the Tennessee Bureau of Investigation (TBI) for testing. He acknowledged that at the

6

defendant's preliminary hearing, Mr. Lopez identified May as the shooter. He said, though, that May and the defendant were about the same height and build. He also said that at the time of the robbery, the defendant's hair was longer than May's hair but that at the preliminary hearing, the defendant's hair was shorter than May's hair.

On cross-examination, Detective Goodwin testified that May's and the defendant's facial features did not change from the time of the robbery to the preliminary hearing. He acknowledged that at the preliminary hearing, Mr. Lopez testified that he could see the shooter's facial features through the pantyhose.

Dinnah Caluag from the TBI firearms investigation laboratory testified that she received live rounds, a shell casing from a spent bullet, a bullet, and a 9mm pistol for testing. She said she examined the pistol, test fired it, and compared the test bullet to the bullet and shell casing found at the crime scene. She concluded that the bullet and the casing came from the pistol. On cross-examination, she acknowledged that the gun had to be hand-loaded but that she did not test any of the live rounds for fingerprints. She said the TBI also was not asked to test the gun for fingerprints. The jury convicted the defendant of especially aggravated robbery and aggravated burglary against Mr. Lopez and aggravated assault against Angel Lopez-Moralez.

Bush, 2004 WL 794755, at *1-5.

### C. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion

opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412. In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> In this and related contexts <u>we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it. See</u>

> Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

In his motion, Petitioner only addresses his insufficiency of the evidence claim. Accordingly, the Court deems his other claims abandoned.[2] As to his remaining claim, Petitioner asserts that the evidence was insufficient to support a finding that the robbers took property from Lopez-Blacos and is therefore insufficient to support the Petitioner's conviction for especially aggravated robbery in count 2 of the indictment.

Addressing Petitioner's insufficiency of the evidence claim, the Tennessee Court of Criminal Appeals found the following:

> The defendant claims that the evidence is insufficient to support his convictions. Regarding his especially aggravated robbery conviction, he contends that the evidence is insufficient because the proof did not show that he took any property from Mr. Lopez or that Mr. Lopez suffered serious bodily injury. Regarding all of his convictions, he claims that the evidence is insufficient because May and Tigg exaggerated his role, if any, in the crimes and were biased against him. The state claims that the evidence is sufficient. We agree with the state.

---

[2]Respondent challenged those claims as procedurally defaulted and time-barred.

9

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn.1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn.1997).

Especially aggravated robbery is defined as robbery that is "(1) [a]ccomplished with a deadly weapon; and (2)[w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401. A person is guilty of theft if that person, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103. "Serious bodily injury" is defined as "bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(a)(34).

The defendant claims that the evidence is insufficient to support his especially aggravated robbery conviction because the state failed to prove a "taking" occurred in this case. Specifically, he contends that a taking was not established because the evidence did not show that the intruders removed any property from Mr. Lopez's person or presence or that Mr. Lopez owned the property. In support of his claim, he notes that although a stereo and CD were taken from another bedroom, this bedroom was occupied by other family members and no proof established "whatsoever that property taken from other family members' separate living quarters constituted property of Pascual Lopez, thereby giving him some type of constructive possession of said property." The state only contends that it was not required to prove that Mr. Lopez owned the stolen property in order for the evidence to be sufficient to support the conviction.

In a robbery case, it is "well settled that the taking from the person may be either actual or constructive." State v. Miller, 608 S.W.2d 158, 160 (Tenn.Crim.App.1980). A taking is actual when it "is immediately from the person" and constructive "when in the possession of the victim or in the victim's presence." Id. This court has held that a victim may constructively possess property even when the property is in another room. See State v. Edwards, 868 S.W.2d 682, 700 (Tenn.Crim.App.1993) (although the victim was raped in her bedroom and bathroom, she constructively possessed the wallet that the defendant took from her living room); see also State v.

10

John David Palmer, No. W1999-01310-CCA-R3-CD, Gibson County, slip op. at 7 (Tenn.Crim.App. Feb. 7, 2001), app. denied (Tenn. June 18, 2001) (stating that "theft of property located in essentially the same building as the victim is located, is sufficient to be 'from the person' of the victim" for the purpose of proving robbery).

" 'Owner' means a person, other than the defendant, who has possession of or any interest ... in property, even though that possession or interest is unlawful." T.C.A. § 39-11-106(a)(26). "[E]vidence of possession is ordinarily sufficient proof of ownership; and this is true although the one in possession may have held the property as bailee, trustee, or otherwise having only a special interest, and not a general ownership of the property." Jones v. State, 166 Tenn. 102, 102, 59 S.W.2d 501, 501 (1933). In determining whether a defendant has been in possession of drugs or stolen property, this court has held that "possession means control." See Peters v. State, 521 S.W.2d 233, 235 (Tenn.Crim.App.1974). Other jurisdictions have held that "possession" can be established simply by showing that the victim has a greater right to the property than the defendant. See State v. McColl, 813 A.2d 107, 127 (Conn.Ct.App.2003); State v. Coburn, 556 P.2d 382, 387 (Kan.1976); State v. Cutwright, 626 So.2d 780, 784 (La.Ct.App.1993); State v. White, 702 A.2d 1263, 1270 (Mary.App.1997); People v. Needham, 155 N.W.2d 267, 270 (Mich.Ct.App.1967); Gray v. State, 797 S.W.2d 157, 161 (Tx.Ct.App.1990); see also State v. John Wayne Singleton, No. 1, Decatur County (Tenn.Crim.App. Sept. 2, 1987), app. denied (Tenn. Nov. 16, 1987) (noting in an armed robbery case that the cashier had a right of possession "superior" to that of the defendant).

In the present case, the state asked Mr. Lopez during direct examination if men came to "your house uninvited," and Mr. Lopez answered, "Yes." The state then continued to question Mr. Lopez about what happened in "your house." During the defense's cross-examination of Angel Lopez-Moralez, it referred to "your uncle's house" and at no time during any testimony did it challenge the inference that the house in question belonged to Mr. Lopez. Taken in the light most favorable to the state, a rational jury could conclude that Mr. Lopez had control of the house from which the defendant and his codefendants took the stereo and CD. Although Mr. Lopez was not present in the bedroom when the items were taken, case law demonstrates that he still constructively possessed them. Moreover, despite the fact that Mr. Lopez was not the owner of the items, he obviously had a greater right to their possession than the defendant. Thus, the evidence is sufficient to show a "taking" from the person of Mr. Lopez.

Bush, 2004 WL 794755, at *5-7.

11

Case 3:07-cv-00630   Document 55   Filed 08/11/10   Page 11 of 14 PageID #: 1660

For a Fourteenth Amendment claim based upon insufficient evidence, in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), the Supreme Court set forth the standard for reviewing the legal sufficiency of the evidence in support of a conviction.

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

443 U.S. at 318-19 (citations and footnotes omitted) (emphasis in original).

Petitioner argues that there was not any evidence that the stereo and compact disk belonged to Lopez-Blacos and that it is undisputed that the stereo and compact disk were taken from another bedroom occupied by other family members and that Lopez-Blacos was not present in the bedroom when the items were taken. Petitioner argues that the state appellate court improperly speculated that Lopez-Blacos had control over the entire house and its contents, including the stereo and compact disk because of the state appellate court's reliance upon references of "your house" to find that the house belonged to Lopez-Blacos. Petitioner argues that "the relevant question for purposes of this summary judgment motion is whether [] Lopez-Blacos had some possessory interest in [the] stereo." (Docket Entry No. 50 at 4).

In applying state law to the facts here, the Court concludes that Tennessee Court of Criminal Appeals reasonably concluded that Lopez-Blacos constructively possessed the property taken by Petitioner while Lopez-Blacos was in Petitioner's custody. In Jones v. State, 383 S.W.2d 20 (Tenn. 1964), a night watchman was bound and blindfolded during an armed robbery. Id. at 21. In finding that the property taken from the night watchman was within the definition of robbery, the Tennessee Supreme Court stated:

> The record plainly shows that the watchman, Lowe, was in the actual presence of the Defendant when he, Lowe, answered the alarm at the rear door and was greeted by two men who thrust pistols into his stomach. From that point on, the victim was in the custody of the Defendant and his accomplice and within hearing distance of the breaking open of the safe, and certainly was in fear of his life.

Id. at 24.

In State v. Norfleet, No. W2000-02229-CCA-R3-CD, 2002 WL 1482666 (Tenn. Crim. App. Feb. 8, 2002), the defendant challenged his conviction for aggravated robbery arguing that the stolen property was not taken from the person of the victim. Id. at *3. There, the victim was working as a donut cutter at a donut shop when the defendant pointed a gun at the victim and placed the victim inside the bathroom, while the defendant stole money from the store's safe. Id. at *1. The victim testified that he did not know how much money was stolen from the store, he merely operated the donut machine, he had no control over the safe or any of the store's money, and that only the store's manager could exercise such control. Id. The defendant argued that the victim lacked control over the money and nothing was taken from his person, but the court concluded, "if an offender, with the intent to deprive the owner, asserts control over property by means of the owner or possessor being removed from the presence of the property by force or fear, the offense of robbery is committed to

Case 3:07-cv-00630 Document 55 Filed 08/11/10 Page 13 of 14 PageID #: 1662

the same degree that it is if the offender carries the property away from the victim's presence." Id. at *3.

Here, in addition to the statements referring to Lopez-Blacos residence as "your house" in the State's proof was that Petitioner pointed a gun at and shot Lopez-Blacos and from that point, Lopez-Blacos was in the Defendant's custody under Tennessee law. Lopez-Blacos, as a resident of the house, had a greater right to possession of the stereo and compact disk than Petitioner and that Lopez-Blacos was in Petitioner's custody. The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. Accordingly, the Court concludes that the state courts reasonably concluded that this claim lacked merit.

For these reasons, the Court concludes that the Respondent's motion for summary judgment should be granted and the Petitioner's motion for summary judgment should be denied and therefore the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

ENTERED this the 11th day of August, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge